**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0167n.06
Filed: March 26, 2008

**No. 06-2487**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MATTHEW TYLER,

    Defendant-Appellant.

                      /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

**BEFORE:**    **MOORE, CLAY, and ROGERS, Circuit Judges.**

    **CLAY, Circuit Judge.** Defendant Matthew Tyler appeals his conviction and sentence of 360 months of imprisonment for conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. For the reasons stated below, we **AFFIRM** Tyler's conviction and sentence.

**BACKGROUND**

    Defendant Matthew Tyler was indicted on February 9, 2005 for conspiracy "to distribute and possess with intent to distribute 500 grams or more of a mixture containing methamphetamine" in

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. His co-defendants were listed as Donald Norton York, David Warren Tice, Jr., Shelli Tice, Jonathan Patrick Rose, and Sergio Coria. The indictment alleged that Tyler and others distributed methamphetamine obtained from Sergio Coria. Tyler pleaded not guilty to this offense on August 8, 2005. Tyler subsequently moved to sever his case from that of the other defendants due to the minor extent of Tyler's alleged involvement in the conspiracy. The district court granted this motion in part as well as a severance motion brought by Sergio Coria. The district court ruled that Tyler and Coria would be tried separately from the remaining defendants but that Tyler and Coria should be tried together. Because Coria failed to appear for trial, Tyler was tried individually. On April 4, 2006, a jury found Tyler guilty of conspiracy to distribute or possess with intent to distribute 500 grams or more of methamphetamine. Tyler was sentenced to 360 months in prison on November 13, 2006. Tyler filed a timely notice of appeal to this Court.

## A. Testimony Presented at Trial

### Randall Scott Tyler

Randall Scott Tyler ("Randy"), Matthew Tyler's brother, testified against Tyler at trial. Randy is currently serving two life sentences for murder that were being appealed at the time of trial. For his testimony, Randy received immunity from prosecution for the conspiracy to sell methamphetamine.

The relevant aspects of Randy's account of Tyler's involvement in the drug conspiracy follow: In 1995, Tyler told Randy that he was buying methamphetamine from one of their childhood friends, Billie Fox. Billie Fox told Randy that Tyler owed Fox $10,000 for methamphetamine,

which would be the cost of approximately one pound of methamphetamine. Fox was being supplied methamphetamine by Sergio Coria beginning in 1995, but Fox soon became heavily indebted to Coria. Because Coria could not recoup the debt Fox owed him, Coria collected from Tyler the money Tyler owed Fox. This incident occurred between eight months and a year after Coria began supplying Fox. After this incident, Tyler began distributing methamphetamine for Sergio Coria instead of buying from Fox. Randy then began buying methamphetamine from Tyler at least once a week in quantities of one to two ounces. Tyler was receiving shipments of five pounds of methamphetamine every couple of weeks. David Tice, another of Fox's major customers, became Tyler's customer, and Tyler would deliver five pounds of methamphetamine at a time to Tice.

Randy moved to South Carolina in late 1997 or early 1998. Immediately after this move Randy stopped selling methamphetamine, but eight months to a year after he moved to South Carolina he began selling methamphetamine again. Randy's supplier in South Carolina did not have good quality methamphetamine, so Randy called Tyler and told him that the supplier would be interested in buying large amounts of methamphetamine. Tyler then traveled to South Carolina and met the supplier. To get the methamphetamine for the supplier, Tyler called Coria, who mailed two pounds of methamphetamine to Randy's South Carolina home. On another occasion Tyler brought Randy four pounds of methamphetamine to sell. Tyler also brought Randy five pounds of methamphetamine to sell to a local supplier, but the local supplier would not accept the drugs because they were not good quality. In 2000, Tyler moved to South Carolina and remained there for approximately ten months. On a few occasions, Randy sold one or two pounds of methamphetamine

3

that Tyler had received from Coria. While Tyler was in South Carolina, Coria stopped sending him drugs to distribute because Tyler was not always giving Coria the money he owed him.

During the period of time that he was distributing methamphetamine, Tyler carried a pistol as was his usual habit. At one point, Tyler went with Randy and other friends to the house of a person who owed Tyler money for drugs. Tyler used a semiautomatic gun to shoot the house of the person who owed him money.

<u>Christopher Scott Perry</u>

Christopher Scott Perry grew up with Tyler in Harrison, Michigan and testified against Tyler at trial. In return for his testimony, the government promised to recommend a more than fifty percent reduction in Perry's 295-month sentence for conspiracy to distribute 500 grams to 1.5 kilograms of methamphetamine and various drug-related crimes.

Perry testified as follows: Perry began buying methamphetamine from Tyler some time prior to 2000. He would buy an ounce of methamphetamine for $1,000 every week or two. At times Perry would buy quarter pounds of methamphetamine from Tyler. This arrangement continued sporadically until 2001. In 2001, Tyler moved to South Carolina, and Perry began getting his methamphetamine directly from Coria.[1] When Tyler returned to Michigan from South Carolina in 2002, Perry sold Tyler a pound of methamphetamine on two occasions. Perry also sold Tyler small quantities of methamphetamine on approximately four occasions. Perry saw Tyler with hunting guns and handguns during the time they were involved in methamphetamine distribution.

---

[1]There is some inconsistency between witnesses regarding the timing of Tyler's move to South Carolina.

## Robyn Kelke

Robyn Kelke, Tyler's ex-girlfriend, testified against him at trial. In exchange for her testimony and cooperation in other matters, she received eighteen months of probation for a state conviction for possession of methamphetamine and possession with the intent to distribute marijuana instead of a possible three- to five-year sentence of imprisonment. She also was promised that she would not be charged in federal court for these drug offenses which would carry a federal sentence of at least five years.

The aspects of her testimony relevant to Tyler's appeal are as follows: Kelke and Tyler lived together between 1993 and 1998. Although Tyler never had a permanent job, he always had money. Kelke never saw methamphetamine in the house that she shared with Tyler, but Tyler talked about selling methamphetamine. Coria frequently came to visit Tyler, and during these visits Tyler would discuss plans for Coria to bring methamphetamine for Tyler to sell. Kelke had no knowledge of the quantities of methamphetamine Coria brought to Tyler. Kelke used methamphetamine twice, and both times Tyler supplied her with methamphetamine. Tyler had both shotguns and handguns during the time Kelke lived with him. Kelke possessed pictures taken in 1997 showing Tyler holding firearms.

Kelke broke up with Tyler in August of 1998. After approximately one year, Tyler began supplying her methamphetamine to sell. Kelke would buy methamphetamine approximately once a month from Tyler in one-ounce quantities. This pattern was not consistent since Tyler left Michigan for a period of time during which Kelke relied on other suppliers. Kelke last bought methamphetamine from Tyler in June of 2004.

## James Besteman

James Besteman was a friend of Tyler who met him in Harrison, Michigan between 1985 and 1986. Besteman testified against Tyler at trial. In exchange for his testimony, Besteman expected to receive leniency with respect to pending federal charges of possession with intent to distribute methamphetamine. Besteman had been previously convicted for a variety of theft and drug-related crimes.

Tyler's role in trafficking methamphetamine as recounted by Besteman follows: Beginning in the mid-nineties, Billie Fox supplied Tyler with methamphetamine that Tyler sold to Besteman. Fox's involvement lasted for approximately a year, but Tyler continued to sell Besteman methamphetamine throughout the 1990s. Besteman started buying small quantities at first, but the amount increased until he was buying quarter-pound quantities of methamphetamine from Tyler. Besteman last purchased methamphetamine from Tyler between 2000 and 2001. In total Besteman purchased methamphetamine from Tyler between fifty and 100 times. At one point, Tyler sent Besteman to pick up five pounds of methamphetamine for him. During the time that Tyler was selling methamphetamine Besteman would frequently see him with handguns.

## Dexter Hughes

Dexter Hughes, Tyler's stepfather, testified regarding Tyler's possession of handguns. Hughes testified that Tyler once gave him a handgun that was wrapped in a rag and asked Hughes to put it into Hughes's safe.

### Other Testimony Presented at Trial

Early Maxey, a methamphetamine user, testified that he had never been offered methamphetamine by Tyler even though he had stated the opposite in conversations with FBI agents. David McWhorter, a confidential informant, testified that Tyler was present when McWhorter came to purchase drugs from David Tice. However, McWhorter testified that Tyler was not present during the actual sale of drugs. Mark Caplan, a methamphetamine user who has known Tyler since high school, testified that he never bought methamphetamine from Tyler even though Caplan had told FBI agents that he had done so. Caplan testified that Tyler had said that he got methamphetamine from Coria. John Michael Cecil, the FBI agent directing the investigation of the methamphetamine conspiracy, testified that there was no direct physical evidence seized from Tyler and there were no recorded conversations of Tyler engaging in drug transactions.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE CLAIM

### A. Standard of Review

Tyler is raising his claim of insufficiency of the evidence for the first time on appeal. Because he did not raise this claim in a Rule 29 motion for acquittal at the close of the prosecution's evidence, Tyler's claim may only be reviewed to determine whether the conviction was a "manifest miscarriage of justice." *United States v. McBride*, 362 F.3d 360, 368-69 (6th Cir. 2004). Under the manifest miscarriage of justice standard, this Court will only "reverse a conviction if the record is devoid of evidence pointing to guilt." *Id.* at 369 (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)). "In analyzing such a claim, we do not weigh the evidence, evaluate witness

credibility, or displace the jury's judgment with our own." *United States v. Wagner*, 382 F.3d 598, 610-11 (6th Cir. 2004).

**B.     Analysis**

Tyler argues that there was no physical evidence of his drug sales and that the only witnesses who testified regarding his drug sales received sentence reductions as a result of testifying against him.  The government presented testimony from multiple witnesses who bought methamphetamine from Tyler, who had witnessed Tyler's drug sales, and who had discussed these drug sales with Tyler.  The record contains ample evidence of Tyler's distribution of more than 500 grams of methamphetamine.[2]  The testimony of Randy Tyler, Christopher Perry, or James Besteman alone would be sufficient to establish the requisite amount.

Tyler contends that since all the evidence offered regarding drug quantities was offered by co-conspirators and others who were receiving leniency in exchange for their testimony, the evidence was unreliable.  He also argues that the testimony regarding the amount of drugs distributed was vague and, therefore, insufficient to establish that Tyler distributed 500 grams of methamphetamine.  Tyler's arguments fail for a number of reasons.  First, this Court does not make credibility determinations in examining the sufficiency of the evidence under a manifest miscarriage of justice standard.  The possible motive of witnesses' testimony does not negate the fact that there is evidence on the record to support the drug amount needed for conviction.  Second, "[t]estimonial evidence from a co-conspirator may be sufficient to determine the amount of drugs for which a defendant should be held accountable, even where the co-conspirator has reason to believe that he may receive

---

[2]Five hundred grams is the equivalent of 17.6 ounces or 1.1 pounds.

a reduced sentence as a result of his or her testimony." *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004). Third, estimations of drug quantities may be sufficient evidence to support a conviction if the exact amount of drugs distributed is not easily ascertained. *Id.* As a result, Tyler's conviction did not result in a manifest miscarriage of justice and may not be overturned due to Tyler's allegations of insufficient evidence.

## II.    SENTENCING DETERMINATION OF THE AMOUNT OF METHAMPHETAMINE

### A.    Standard of Review

The district court's factual findings made at sentencing are reviewed for clear error. *United States v. Kaminski*, 501 F.3d 655, 665 (6th Cir. 2007). Since the district court's determination of the amount of methamphetamine Tyler distributed is a factual finding, it may not be overturned unless it is clearly erroneous. The government must prove sentencing facts by a preponderance of the evidence. *United States v. Hunt*, 487 F.3d 347, 350 (6th Cir. 2007).

### B.    Analysis

#### 1. Evidentiary support for the application of USSG § 2D1.1(c)(2)

Tyler argues that the district court clearly erred because the amount of methamphetamine distributed was not proven by a preponderance of the evidence. Tyler's base offense level was calculated as 36 due to the distribution of between 5 and 15 kilograms of methamphetamine. U.S. Sentencing Guidelines Manual ("USSG") § 2D1.1(c)(2) (2005). In overruling Tyler's objection to the amount of methamphetamine attributed to Tyler, the district court found that there was ample evidence that Tyler distributed at least 5 kilograms of methamphetamine.

For this finding, the court relied upon the testimony of Randy Tyler and James Besteman. Randy testified regarding his weekly purchases of one or two ounces of methamphetamine from Tyler for the span of over a year. This testimony supported the PSR's estimate that Randy bought one ounce of methamphetamine from Tyler for 52 weeks, resulting in a calculation of 52 ounces or 1.47 kilograms of methamphetamine. Randy's testimony regarding Tyler's distribution of methamphetamine to David Tice in five-pound increments was also relied on by the district court. This testimony supported the PSR's estimate that Tyler sold Tice five pounds (2.268 kg) of methamphetamine at least once. Based upon its recollection of Randy's testimony at trial, the district court found Randy's testimony credible regarding the drug quantities for which Tyler was responsible. The district court did find one error in the PSR's calculation of the amount of methamphetamine attributable to Tyler. The PSR claimed that Tyler made two shipments of four pounds (1.8 kg) of methamphetamine to Randy while Randy was in South Carolina, but Randy only testified to one four-pound shipment. As a result of this discrepancy, the district court subtracted two kilograms from the PSR's estimated total drug amount of 13.3 kilograms.

The district court also relied upon Besteman's testimony that over a five- to six-year period he bought one to four ounces of methamphetamine from Tyler between fifty and 100 times. This testimony supported the PSR's estimate that Besteman bought 50 ounces (1.42 kg) of methamphetamine from Tyler. The district court did not find that Besteman's testimony would be reliable for giving a very precise quantity of methamphetamine, but the court found Besteman's testimony credible enough to support an estimate that he bought 50 ounces from Tyler. After discussing Tyler's objections regarding the drug amount established by Randy's and Besteman's

testimony, the district court determined that a base offense level of 36 was warranted since the total methamphetamine distributed was clearly more than 5 kilograms. USSG § 2D1.1(c)(2).

There was no clear error in the district court's finding that Tyler distributed more than 5 kilograms of methamphetamine. Where evidence is supported by sufficient indicia of reliability, the district court may consider it at sentencing. USSG § 6A1.3(a) (2005). The fact that multiple witnesses testified to their personal knowledge of Tyler's distribution of much more than 5 kilograms of methamphetamine is a strong indicator of the reliability of the testimony supporting the district judge's finding.

## 2. Compliance with Rule 32(i)(3)

Tyler also argues that the district court erred by failing to specifically address each of Tyler's objections regarding the calculation of the amount of methamphetamine distributed contained in the Pre-Sentencing Report ("PSR"). Federal Rule of Criminal Procedure 32(i)(3)[3] provides:

> At sentencing, the court:
> (A) may accept any undisputed portion of the presentence report as a finding of fact;
> (B) must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing; and
> (C) must append a copy of the court's determinations under this rule to any copy of the presentence report made available to the Bureau of Prisons.

---

[3]In his brief on appeal, Tyler cites Federal Rule of Criminal Procedure 32(c)(3)(D) for the proposition that the district court must address each objection to a PSR. Tyler is referring to an outdated version of the Federal Rules of Criminal Procedure because the passage of a 2002 amendment to the rules has made the applicable rule for this proposition 32(i)(3).

Prior to sentencing, Tyler disputed twenty aspects of the PSR. On appeal Tyler contends that the district court did not make factual findings regarding some of his disputes regarding the drug quantity attributed to him. In particular, Tyler claims that the district court did not make factual findings regarding Controverted Item 7, in which he challenged the lack of evidence corroborating Randy's testimony regarding the drugs he bought from Tyler, and Controverted Item 9, in which he challenged the PSR's characterization of Kelke's testimony and her credibility.

Tyler objected to the portion of the PSR that stated that Randy had bought two pounds of methamphetamine from Tyler while Tyler was living in South Carolina. Tyler claimed that Randy's testimony was vague and that there was no evidence corroborating his testimony. The court noted that the resolution of this dispute would make no difference to the offense level since in ruling on the earlier controverted items it had already found that Tyler's distribution of more than five kilograms of methamphetamine had been proven by a preponderance of the evidence. Tyler's attorney agreed with the court that the resolution of this controverted item would not alter the calculation of Tyler's base offense level.

Tyler also objected to the PSR's determination that Kelke had bought one pound of methamphetamine from him. He claimed that this amount was not supported by her testimony at trial and that she was not credible due to her agreement with the government. The court never specifically discussed this issue, but after stating that a determination regarding Controverted Item 7 would be unnecessary due to the finding that Tyler distributed more than five kilograms of methamphetamine, the judge stated: "[t]here are other controverted items, but I believe with respect to the drug quantities, the balance of the controverted items really are tied into the ones that we

12

resolved and deal primarily with the cyphering and the calculation . . ." (J.A. 372.) Thus, the court indicated that it had already determined that further objections to the drug quantity would not affect Tyler's base offense level. In its response to Controverted Items 7 and 9, the court acted in compliance with Rule 32(i)(3)(B) when it "determine[d] that a ruling is unnecessary . . . because the matter [did] not affect sentencing." Fed. R. Crim. P. 32(i)(3)(B).

### III. TWO LEVEL ENHANCEMENT FOR POSSESSING A DANGEROUS WEAPON

#### A. Standard of Review

The district court's factual findings regarding the application of the Guidelines are reviewed for clear error. *United States v. Kaminski*, 501 F.3d 655, 665 (6th Cir. 2007). However, the district court's conclusions of law are reviewed *de novo*. *United States v. Ward*, 506 F.3d 468, 474 (6th Cir. 2007).

#### B. Analysis

This Court has noted that "[a]n enhancement under § 2D1.1(b)(1) is proper only if the government establishes, by a preponderance of the evidence, that (1) the defendant possessed a dangerous weapon (2) during the commission of a drug-trafficking offense." *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002). This Court has also interpreted the phrase "during the commission of a drug-trafficking offense" as referring to the period of time in which the conspiracy to traffic drugs occurred. *Id.* When the government has proven these two elements, there exists a rebuttable presumption that the weapon was possessed in connection with the offense. As stated in the commentary to § 2D1.1, the upward adjustment for firearms possession "should be applied if the

13

weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.3 (2005).

Tyler contests the district court's application of a two level enhancement pursuant to USSG § 2D1.1(b)(1) for possessing a dangerous weapon. At trial photographs were introduced into evidence in which Tyler was shown holding a pistol and an assault rifle. Robin Kelke testified that these pictures were taken in 1997. Randy also testified that Tyler used a firearm to shoot the house of someone who owed him money for drugs. Tyler claims that there was no proof that the weapons he possessed were used in connection to drug offenses and that there was evidence that he used guns for hunting. He also claims that Randy's testimony was self-serving and uncorroborated. Tyler's explanations do not establish that it was clearly improbable that guns were possessed in connection with the offense. Therefore, the district court's application of the enhancement for the possession of firearms was proper.

## IV. SUBSTANTIVE REASONABLENESS OF TYLER'S SENTENCE

### A. Standard of Review

This Court reviews a district court's ultimate sentencing decision for reasonableness. *Gall v. United States*, 128 S.Ct. 586, 594 (2007). A sentence is reviewed for substantive reasonableness under an abuse-of-discretion standard. *Id.* at 597. "The fact that [this Court] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.* This Court applies a presumption of substantive reasonableness to within-Guidelines sentences. *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

**B.**     **Analysis**

We have held that "[a] sentence may be substantively unreasonable where the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *United States v. Jones*, 489 F.3d 243, 252 (6th Cir. 2007) (internal quotations and alterations omitted). Tyler contends that due to the effect of the overrepresentation of his criminal history on his Guidelines sentencing range, his sentence "is 'greater than necessary' in light of [the factors set forth in § 3553(a)(2)](B) and (C) of the sentencing statute, deterrence and preventing the public from further crimes, and is therefore not reasonable." (Def. Br. 32.)

Tyler's criminal history score was calculated as 21, placing Tyler in criminal history category VI. The criminal history score was calculated as follows: 2 points for attempting to unlawfully drive away a motor vehicle, 2 points for receiving and concealing stolen property of $100 or less, 2 points for attempted larceny in a building, 2 points for driving with a suspended license, 2 points for assault or assault and battery, 1 point for operating a motor vehicle while impaired, 1 point for simple possession of marijuana, 2 points for attempting to resist arrest and obstruct justice and domestic violence, 3 points for delivering or manufacturing a controlled substance, 2 points for driving with a suspended license and possession of marijuana, and 2 points for committing the instant offense less than two years after release from imprisonment. At sentencing Tyler argued that his criminal history category of VI was inappropriate because the majority of the crimes he committed were traffic violations and property crimes. In response the judge reasoned:

> Well, Mr. Tyler is 34 years old and has a criminal history reported going back to age 17, and there are some other offenses that predate that, that, of course are unscored.

Now, there are – it's true that there are offenses that deal with theft and with traffic violations throughout this rather long history of criminal involvement, but Mr. Tyler has been in and out of trouble with the law for an awful long time.

The purpose of the criminal history category scoring is to assess recidivism or the potential for recidivism under the rationale that past conduct is an accurate or at least perhaps the most reliable measure of or predictor of future conduct, and given the nature of the offenses, the larceny, the auto theft, the domestic violence, the resisting and obstructing a police officer, manufacturing marijuana, assault, these offenses are I believe, emblematic of an individual who has a very difficult time conforming his requirements – conforming his conduct to the requirements of the law, and I don't believe that showing Mr. Tyler in the highest of criminal history categories with 21 points, when that category itself tops out at 13 points – or begins at 13 points. This is significantly more than sort of eking into the bottom edge of the category. I don't find that it is overrepresented, . . .

(J.A. 388.) This dialogue between the court and defense counsel occurred in the course of the court's determination of the proper Guidelines range of 360 months to life. The court then asked for argument regarding the application of the 3553(a) sentencing factors. Tyler's counsel argued that the mandatory minimum sentence of 20 years was sufficient to serve the goals of 3553(a). Tyler then spoke on his own behalf, mainly arguing that there was an insufficient evidentiary basis for his conviction. In deciding what sentence to impose, the court noted that Tyler had a long history of criminal violations that was reflected in his criminal history score. The court also examined the policy reasons for the lengthy sentence suggested by the Guidelines and added that the deterrent effect of a lengthy sentence would be appropriate to dissuade others from engaging in the lucrative business of drug-dealing and that it was important to incapacitate Tyler because of his violent propensities that were testified to at trial. As a result, the court imposed a sentence of 360 months, at the bottom of the Guidelines range. From this record, there is no evidence that the district court

abused its discretion in imposing a 360-month sentence despite the nature of Tyler's prior convictions.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Tyler's conviction and the sentence imposed by the district court.