**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1998
_____

UNITED STATES OF AMERICA

v.

ABDUR RAZZAK TAI,
                          Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
(D.C. No. 2-10-cr-00769-001)
District Judge:  Honorable Juan R. Sanchez
_____

Argued March 27, 2014

Before: FUENTES and SHWARTZ, <u>Circuit Judges</u>, and
ROSENTHAL, <u>District Judge</u>.[*]

_____

        [*] The Honorable Lee H. Rosenthal, United States
District Judge for the Southern District of Texas, sitting by
designation.

Paul G. Shapiro, Esq. [ARGUED]
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
          *Counsel for Appellee*

Peter Goldberger, Esq. [ARGUED]
50 Rittenhouse Place
Ardmore, PA 19003
          *Counsel for Appellant*

_____

OPINION
_____

SHWARTZ, <u>Circuit Judge</u>.

Defendant Abdur Razzak Tai appeals his conviction and sentence for mail and wire fraud in connection with claims for payment from the Fen-Phen Settlement Trust. Tai argues that the District Court committed plain error by implicitly shifting the burden of proof in its "willful blindness" jury instruction and applying upward adjustments under the advisory Sentencing Guidelines for abuse of a position of trust, use of a special skill, and aggravated role. For the reasons set forth below, we conclude that the District Court's jury instruction and its upward adjustments based upon position of trust and special skill were not in error, but we will remand to enable the District Court to make the

required factual findings concerning whether Tai supervised a criminally culpable subordinate, which is necessary to award an aggravated role enhancement.

# I

In the late 1990s, individuals who had taken the prescription diet-drug combination commonly known as Fen-Phen began filing lawsuits against American Home Products Corporation ("AHP"), the predecessor of Wyeth, claiming that the drugs caused valvular heart disease. In 2000, the United States District Court for the Eastern District of Pennsylvania approved a class action settlement (the "Settlement"), which included the establishment of the Fen-Phen Settlement Trust (the "Trust"), through which Wyeth paid compensation to class members who demonstrated that they sustained valvular heart damage.

Financial compensation for these heart conditions was determined under a pre-established matrix.[1] To receive compensation, claimants were required to provide a recording of and a physician's report about an echocardiogram ("echo")[2] and a document referred to as a "Green Form"[3]

---

[1] The amount of a claimant's benefits was determined by several factors, including the length of time the claimant used Fen-Phen, the severity of the claimant's valvular heart condition, and the claimant's age.

[2] Typically, a technician performed and video recorded the echoes, and a qualified physician reviewed the video and the technician's worksheet setting forth the measurements.

[3] The Green Form provided the formulae for determining if the claimant had a condition that qualified for

3

signed by a board-certified cardiologist or cardiothoracic surgeon with Level 2 training in echocardiography.[4]   The Trust then reviewed the submissions and, when appropriate, tendered payment.

A representative of the Trust explained that the Trust relied on the integrity of the physicians signing the reports and Green Forms to ensure that the claimants actually had heart conditions that were covered by the Settlement.  Both the Trust and Wyeth had "audit rights," which allowed them to have highly trained, board-certified physicians review the materials submitted to ensure "the tape . . . matche[d] with the rest of the substantiation."  App. 87.  Under the original terms of the Settlement, only 15% of all claims could be audited.  In November 2002, the District Court ordered that 100% of the claims would be subject to audit because of concerns about the bona fides of the claims being submitted.[5]

---

compensation.   Part II of the Green Form required the physician to sign beneath a warning that explained that it was an official court document and the physician was declaring, under penalty of perjury, that the information on the form was correct.

[4] Level 2 training reflects a high degree of experience reading and interpreting echoes.

[5] On March 15, 2005, the District Court approved an amendment to the Settlement (the "Seventh Amendment"), under which Wyeth agreed to create a new supplemental fund with a separate, faster process for reviewing and paying claims for which there was documentation that on its face qualified the claimant for Matrix Benefits.  The Seventh Amendment claims were all subject to medical review.

Attorneys who represented certain Fen-Phen claimants retained Tai, a board-certified and Level 2-qualified cardiologist, to read echoes and prepare reports to submit to the Trust. Tai estimated that he read 12,000 echoes for this purpose, and asserted that he was owed over $2 million dollars for the services he provided. This amount was based upon a fee for each echo read and a bonus payment for each approved payment.[6] Most of the Green Forms Tai signed were submitted before the 100% audit rule was imposed.

Tai acknowledged to law enforcement that in about 10% of the cases, he dictated physician's reports consistent with the findings in the technicians' reports despite knowing that the measurements were wrong. He also admitted that he had his technician and office manager, Debbie Patrick, review about 1,000 of the echoes because he did not have the time to do the work himself. Patrick testified, via deposition, that she reviewed "a couple hundred" echoes, App. 605, and provided Tai with her notes to "help him out" with the volume of echoes he was asked to review. App. 589-90. Patrick testified that she did not know whether Tai read the echoes himself before signing the physician's report and Green Form, but she "would assume that he did because there were several times that [she] even asked him" if he agreed with her conclusions and he sometimes told her she was wrong. App. 591-92. For one particular lawyer representing Fen-Phen claimants, Tai signed more than 1,400 Green Forms, and of the 1,173 of those Green Forms that were audited or reviewed, only 109 were approved. A government expert

---

[6] For example, one attorney agreed to pay Tai a $100-150 fee for each echo read, plus an additional "expert fee" of $900-1000 for each Green Form that the Trust approved.

reviewed a nonrandom sample of the forms Tai submitted for this attorney and found that, in a substantial number of the cases, the measurements were not only clearly incorrect, but were actually inconsistent with a human adult heart.[7]

Tai was charged in a thirteen-count indictment for mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively. The jury found Tai guilty of all charges, and he was sentenced to concurrent sentences of 72 months' imprisonment[8] and three years' supervised release, and ordered to pay restitution of $4,579,663, a fine of $15,000, and a special assessment of $1,300. Tai appeals.

---

[7] Tai testified that he agreed with these conclusions but claimed that the signature on the physician reports attributed to him was not his. Tai's employees, however, testified that it was his signature, and, in fact, his office administrator testified that she had stamped Tai's signature on the reports with his permission.

[8] The base offense level was 7, 18 levels were added under U.S.S.G. § 2B1.1(b)(1)(J) (loss was more than $2.5M but less than $7M), 2 levels were added under U.S.S.G. § 3B1.3 (defendant used a special skill or abused his position of trust), and 2 levels were added under U.S.S.G. § 3B1.1(c) (defendant was an organizer, leader, manager or supervisor). This resulted in an offense level of 29, with an applicable advisory Guidelines range of 87-108 months. The District Court then granted a two-level variance following consideration of the Section 3553(a) factors due to Tai's age and health, and lowered the offense level from 29 to 27, with an applicable Guidelines range of 70-87 months. The Court sentenced Tai near the bottom of that range to 72 months' imprisonment.

## II[9]

     The parties agree that none of the issues Tai presents were preserved for appeal and that plain error review applies.[10] United States v. Couch, 291 F.3d 251, 252-53 (3d Cir. 2002) (stating that where no objection to the Guidelines calculation was preserved at sentencing, it is reviewed for plain error); United States v. Antico, 275 F.3d 245, 265 (3d Cir. 2001) (reviewing a jury instruction for plain error where the challenge on appeal was not raised at trial); Fed. R. Crim. P. 30(d), 52(b). The defendant bears the burden to establish plain error. United States v. Olano, 507 U.S. 725, 734-35 (1993). For reversible plain error to exist, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings. Johnson v. United States, 520 U.S. 461, 466-67 (1997).

---

[9] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

[10] At argument, the Government for the first time argued that Tai waived his right to appeal the role enhancement because he withdrew his objection to its imposition before sentencing. While we recognize that withdrawing an objection constitutes a waiver of the right to appellate review in most instances, we will not foreclose appellate review in this case, where the Government did not rely on waiver in its brief and enforcing the waiver rule here would not serve "the interests of justice." United States v. Barrow, 118 F.3d 482, 491 (6th Cir. 1997).

## III

### A. Jury Instruction

We will first address whether the District Court committed plain error by employing the language of the Third Circuit's model jury instruction when instructing the jury about willful blindness. Tai argues that the model jury instruction is constitutionally infirm because it shifts the burden of proof to the defendant to disprove intent.

A willful blindness instruction is typically delivered in the context of explaining how the Government may sustain its burden to prove that a defendant acted knowingly in committing a charged offense. Here, the willful blindness instruction was delivered after the District Court explained the elements common to mail and wire fraud, including that the Government must prove that Tai "acted knowingly with respect to an element of the offenses." Supp. App. 824. The District Court defined "knowingly" as meaning "that the Government must prove beyond a reasonable doubt that he was conscious and aware of the nature of his actions and of the surrounding facts and circumstances as specified in the definition of the offenses charged." Id. The District Court then instructed the jury as follows:

> As I just explained, members of the jury, to find Dr. Tai guilty of mail fraud or wire fraud, you must find that the Government proved beyond a reasonable doubt that Dr. Tai knowingly devised or wil[l]fully participated in

8

a scheme to defraud, and that he acted with intent to defraud.

Both of these elements involve the question of whether Dr. Tai had knowledge of an inaccuracy of the echocardiogram reports and green form[s] that he signed.

When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the Government may prove that Dr. Tai knew of the fact or circumstance if the evidence proved beyond a reasonable doubt that Dr. Tai deliberately closed his eyes to what would otherwise have been obvious to him.

No one can avoid responsibility for a crime by deliberately ignoring what is obvious; thus, you may find that Dr. Tai knew about the falsity of the echo reports and green forms based on evidence which proves that, one, Dr. Tai himself actually subjectively believed that there -- there was a high probability that the reports or forms were not accurate, and, two, Dr. Tai consciously took deliberate actions to avoid learning about the existence of the falsity.

You may not find Dr. Tai knew that the reports or forms were not accurate **if you find that the defendant actually believed that the reports and forms were accurate.** Also, you may not find that Dr. Tai knew the reports and forms were not accurate **if you -- you find only that Dr. Tai consciously disregard [sic] a risk that the reports and the forms were not accurate or that Dr. Tai should have known**

> **that the reports and forms were not accurate, or that a reasonable person will have known of a high probability that the reports and forms were not accurate.**
>
> It is not enough that Dr. Tai may have been reckless or stupid or foolish or may have acted out of accident. You must find that Dr. Tai himself actually subjectively believed that there was a high probability that the reports and forms were not accurate, consciously took deliberate actions to avoid learning about their inaccuracy and did not actually believe that they were accurate.

Supp. App. 828-30 (emphasis added). Tai argues that the emphasized phrases in the fifth paragraph told the jury that certain innocent states of mind preclude a finding of knowledge, and he asserts that this suggests to the jury that it can find that Tai did not meet the element of knowledge only if the jury finds those innocent states of mind to have existed. This in turn, Tai argues, impermissibly shifts the burden from the government to Tai to disprove his knowledge.

There is no doubt that a jury instruction violates due process if it fails to place squarely on the Government the full burden of proving beyond a reasonable doubt the required mental state for the offense. See Patterson v. New York, 432 U.S. 197, 204-07 (1977). The language of the fifth paragraph, however, did not impose any burden, implicit or explicit, on Tai to prove or disprove his knowledge. Rather, the willful blindness jury instruction as a whole came after the jury was told the Government bears the burden to prove that Tai acted knowingly and with an intent to defraud. The

10

willful blindness instruction then explicitly explained that "the Government may prove" this element through evidence that established beyond a reasonable doubt that Tai "deliberately closed his eyes to what would otherwise have been obvious to him." Supp. App. 829. The instruction then explained to the jury what this meant and how it could not find him guilty if the jury found that Tai actually believed the forms were accurate, that he disregarded a risk of inaccuracy, or that he or a reasonable person should have known the reports were inaccurate. The instruction then reiterated that, to convict, the jury must find Tai subjectively believed there was a high probability the reports were inaccurate and he consciously took steps to avoid learning about their inaccuracy. These instructions told the jury when willful blindness does or does not exist, but did not imply in any way that Tai must present evidence concerning his own beliefs or knowledge. Thus, there was no implicit or explicit shifting of the burden of proof to Tai.[11]

---

[11] Courts have approved similar instructions. United States v. Flores, 454 F.3d 149, 158 (3d Cir. 2006) (stating that a willful blindness instruction saying that "[i]f the [evidence] shows you that [the defendant] actually believed . . ." reflected the "correct burden of proof"); see also United States v. Clay, 618 F.3d 946, 952 & n.5 (8th Cir. 2010) (approving the following in a willful blindness instruction: "You may not find [defendant] acted 'knowingly' if you find he was merely negligent, careless, or mistaken . . . . You may not find that [defendant] acted knowingly if you find that he actually believed . . ." and finding no merit to the argument that this instruction shifted the burden of proof).

11

Moreover, the District Court told the jury that it could not find knowledge based on a willful blindness theory unless the Government proved Tai's knowledge beyond a reasonable doubt, and in fact the jury was expressly told at the beginning of the instructions that Tai never had to prove anything, and that the burden always remained on the government.[12] This was "more than sufficient to dispel any possible misconception that [Tai] bore a burden to prove that he was not willfully blind." United States v. Flores, 454 F.3d 149, 159 (3d Cir. 2006) (holding that even when the district court had misspoken and erroneously shifted the burden of proof in its willful blindness instruction, repeated references to the government's burden and the district court's general instruction that the burden does not shift ensured that there was no plain error). When the instructions are read as a whole, it is clear that no jury could conclude that Tai bore the burden of proof as to any aspect of his knowledge and the District Court committed no error in connection with its willful blindness instruction.

---

[12] The District Court instructed that

[t]he presumption of innocence means that the defendant has no burden or obligation to present any evidence at all or to prove that he is not guilty. The burden or obligation of proof is on the Government to prove that the defendant is guilty, and this burden stays with the Government throughout the entire trial.

Supp. App. 818-19.

**B. Sentence**

**1. Abuse of a Position of Trust or use of a Special Skill under U.S.S.G. § 3B1.3**

Tai argues that the District Court plainly erred by imposing a two-level increase under U.S.S.G § 3B1.3 for abuse of a position of trust and use of a special skill. Section 3B1.3 allows an increase of two offense levels "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Because either an abuse of a position of trust or use of a special skill supports the two-level enhancement the District Court applied, Tai must establish plain error with respect to both to avoid it. We will examine each separately.

a. Abuse of Position of Trust

To receive an enhancement for abusing a position of trust, the facts must show that the defendant took "criminal advantage of a trust relationship between himself and his victim." United States v. Hickman, 991 F.2d 1110, 1112 (3d Cir. 1993). Courts consider the following three factors to determine whether a position of trust or a trust relationship exists: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position."[13] United

---

[13] Tai argues that the position of trust guideline applies only to those who were selected or paid for by the entity with

13

States v. Dullum, 560 F.3d 133, 140 (3d Cir. 2009) (internal quotation marks omitted). Once a position of trust has been found, § 3B1.3 requires a finding that the defendant "abused that position in a way that significantly facilitated his crime." United States v. Sherman, 160 F.3d 967, 969 (3d Cir. 1998) (internal quotation marks omitted).

As to the first factor, Tai's position as a cardiologist with Level 2 training in echocardiology allowed him to commit a difficult-to-detect wrong. Only an equally well-trained physician was permitted to support claims for payment and only one with access to the same patient information would be able to detect Tai's fraud. Indeed, it would be impossible to verify the accuracy of his reports

---

whom the trust relationship is said to exist. He provides no support for this position and, indeed, our precedent makes clear that this is not a requirement. See United States v. Sherman, 160 F.3d at 967, 970 (3d. Cir. 1998) (holding that a doctor was in position of trust with insurance company who insured his patients). At argument, Tai tried to distinguish Sherman on the grounds that insurance companies approve providers under a health insurance plan and are therefore in a pre-existing trust relationship with those providers. Our analysis in Sherman, however, did not make this distinction, as we did not focus on whether the insurance company had pre-approved the doctor, but instead concentrated on the fact that "the insurance company relied on the integrity of Sherman as a doctor holding a medical license." Id. Like the insurance company in Sherman, the Trust accepted Tai's representations because of his expertise.

14

without a second and similarly qualified doctor reviewing the same information.[14]

As to the second factor, Tai had a large degree of authority over the submission of the claims as he was one of the physicians authorized to read echoes and sign Green Forms for submission to the Trust. Moreover, his license and experience allowed him to do so without supervision.

As to the third factor, the very nature of the Settlement and structure of the Trust required reliance on the integrity of the doctors who were signing the physician reports and Green Forms. To verify the existence of qualifying heart damage, the Trust depended upon the fact that licensed and board-certified cardiologists or cardiothoracic surgeons with Level 2 training in echocardiography had reviewed the claimants' echoes and had prepared and signed reports attesting to the findings under penalty of perjury. See United States v. Liss, 265 F.3d 1220, 1229 (11th Cir. 2001) ("Of the other circuits that have addressed whether a physician occupies a position of trust in relation to Medicare, or a private insurance carrier,

---

[14] Tai relies on United States v. DeMuro, 677 F.3d 550 (3d Cir. 2012), in which this Court held that the "difficult to detect" factor of the position of trust analysis had not been proven when defendants had failed to pay taxes that they had withheld from employees' paychecks and placed into a trust fund account the IRS required defendants to maintain. Id. at 555, 567-68. The defendants in DeMuro, however, did not exercise any professional judgment in their actions vis-a-vis the IRS trust fund on which the IRS relied, and thus that situation is very different from the one here.

15

all have answered that question in the affirmative.").  It was reasonable for the Trust to have relied upon Tai's representations both based on his training and the fact that to have a second doctor "shadow him" would be an unreasonable expense.  Sherman, 160 F.3d at 970.

Finally, Tai's credentials, and the deference he was accorded as a result of them, placed him in a position that facilitated his criminal conduct.  His signature gave claimants the opportunity to receive, collectively, hundreds of millions of dollars in compensation, yielding more than $2 million in potential payments to him.

The Trust's ability to audit claims does not mean that the Trust limited the authority the doctors were given to submit claims and the expectation that they would have done so honestly.   See Sherman, 160 F.3d at 970.  Rather, the Trust depended almost exclusively on the professional integrity of the physicians who submitted reports and signed Green Forms under penalty of perjury, particularly during the period Tai submitted most of the claims.  Many of Tai's reports were signed and completed when the Trust and Wyeth were entitled to audit up to only 15% of the claims.  Moreover, the audit looked only at whether any reasonable physician could have reached the conclusion of the certifying cardiologist that the claimant had the heart condition depicted in the echocardiogram tape, and thus the audit was geared toward accepting the medical judgments of the highly trained physicians who rendered them.  Cf. Sherman, 160 F.3d at 970 (upholding abuse of trust adjustment for a physician who occupied a position of trust with the insurance company to which he submitted inflated bills and rejecting defendant's argument that his authority to act was narrowed by insurance

16

company oversight via regular audits of bills submitted to them).

For these reasons, the District Court did not plainly err in finding Tai abused a position of trust and enhancing his sentence under § 3B1.3.

b. Use of Special Skill

Although the abuse of a position of trust alone is sufficient to justify the two-level enhancement under § 3B1.3, we will also examine whether it was plain error to find that Tai also used a special skill. The following two factors must be present to support the application of an upward Guidelines adjustment for use of a special skill: "(1) the defendant possesses a special skill; and (2) the defendant used it to significantly facilitate the commission or concealment of the offense." United States v. Batista De La Cruz, 460 F.3d 466, 468 (3d Cir. 2006).

Tai admits that he possessed a special skill as a highly trained doctor but argues instead that he does not meet the second prong of the test because he did not use his special skill to commit his crimes as he refrained from exercising his skill when he did not review the echoes and simply signed the reports.

Here, Tai's skill and credentials were the means by which he could participate in the claims process. Without them, he would not have been permitted to submit reports to support claims and collect a fee. Moreover, without his training, Tai would have lacked the skill to review the videos of the echoes, would have been unable to determine whether

17

the technicians' conclusions were correct or incorrect, and would have been unable to decide whether a particular case was one that was wrong but that he would "let . . . go." Supp. App. 645-46; see United States v. Lewis, 156 F.3d 656, 659 (6th Cir. 1998) ("Unlike simply billing for a procedure that has not been performed, exaggerating the nature of a medical procedure does require the use of special medical knowledge."). Thus, Tai's special skill was integral to his commission of his crimes and the District Court did not err in finding Tai used a special skill to commit his crime.

## 2. Aggravated Role under U.S.S.G. § 3B1.1(c) [15]

Lastly, Tai argues that his two-level leadership enhancement under U.S.S.G. § 3B1.1(c) was unwarranted. Section 3B1.1 allows for a two-level enhancement if the defendant was "an organizer, leader, manager, or supervisor in any criminal activity" with fewer than five participants. A participant is defined as "a person who is criminally

---

[15] If the enhancement under § 3B1.3 had been based only on the use of a special skill, the role enhancement would not apply. See U.S.S.G § 3B1.3 ("[I]f this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." (emphasis added)); Hickman, 991 F.2d at 1112 & n.5 (accord, but noting that the basis for this distinction is unclear and the connection "between . . . supervising others and using a special skill [is] elusive"). Because we conclude that the enhancement is applicable based upon both the abuse of a position of trust and use of a special skill, it is appropriate to consider the application of a role enhancement.

18

responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant." U.S.S.G. § 3B1.1 cmt. n.1. To be deemed "a participant under the Guidelines," the "individual must be criminally responsible, i.e., s/he must have committed all of the elements of a statutory crime with the requisite mens rea." United States v. Badaracco, 954 F.2d 928, 934-35 (3d Cir. 1992). Thus, to apply the enhancement, "the government must prove by a preponderance of the evidence that the [alleged participants] were criminally responsible participants." Id. at 935.

Tai initially objected to the inclusion of this enhancement. After receiving the Government's sentencing memorandum, Tai sent a letter to the District Court withdrawing the objection. As a result, the Government presented no additional evidence concerning this enhancement at sentencing and the District Court made no factual findings concerning its applicability other than to say:

> An additional two levels were added pursuant to the guideline section 3B1.1(c) because he was an organizer, leader, a manager or supervisor in criminal activity[,] based on his employment of a non-physician technologi[st] whom he directed to read echocardiograms and then prepared and signed a physician's echocardiogram report falsely implying or asserting the conclusions were the result of his own observations and conclusions.

19

App. 672-73 (emphasis added). Absent from this recitation is any statement about whether the "technologist" had the requisite state of mind to be deemed criminally responsible. Furthermore, to the extent the District Court incorporated by reference the explanation in the PSI concerning the role adjustment, the PSI also lacked facts from which to conclude that the technologist acted with the requisite mens rea. [16] Under our precedent, the culpable participation of the person being supervised is central to the applicability of an upward

_____

[16] The PSI, which the District Court adopted, stated the following as the basis for applying the § 3B1.1 adjustment:

> Adjustments for Role in the Offense: The defendant employed a technologist in his office, identified as D.P., who was qualified to conduct echocardiograms, but who was not a physician, and did not have Level II training in echocardiography. In order to save his own time, and in abrogation of his obligation to exercise independent medical judgment, the defendant directed D.P. to read echocardiograms that had been submitted by . . . attorneys who represented persons who claimed to have been injured as a result of having ingested Fen-Phen, and then prepared and signed physician's echocardiogram reports that falsely implied or asserted that his conclusions were the result of his own observations and conclusions. Pursuant to U.S.S.G. § 3B1.1(c), two levels are added.

PSI ¶ 54.

adjustment for role. The question here then is whether the absence of such a finding of criminal culpability of a participant constitutes plain error. We conclude that it does.

First, the error was plain, as <u>Badaracco</u> has been the law of this Circuit since 1992, and to sentence Tai based on his role supervising a technologist in the absence of any finding about that person's culpability is contrary to established law.

Second, the error affects Tai's substantial rights, as it affects the length of his sentence. <u>United States v. Pollen</u>, 978 F.2d 78, 90 (3d Cir. 1992). Here, the two-level enhancement for an aggravated role raised Tai's advisory Guidelines offense level from 27 to 29, with an advisory range of 87-108 months. The District Court varied downward by two offense levels from that range because of Tai's age and health, and imposed a term at the low end of the 70-87 month range of 72 months' imprisonment. If the offense level had not been enhanced for an aggravated role, then the Guidelines offense level would have been calculated at 27, and if the District Court had applied the same variance, it would therefore have lowered the offense level to 25, with an applicable range of 57 to 71 months. If the District Court had again chosen to sentence near the bottom of that range, then the sentence could have been less than five years, which is a year shorter than the sentence he received.

Finally, we exercise our discretion to correct the error because it increased the sentence without the necessary fact finding and thereby affected the integrity of the proceedings. <u>United States v. Saferstein</u>, 673 F.3d 237, 244 (3d Cir. 2012) (concluding that a higher sentencing range "too seriously

21

affects the fairness, integrity, or public reputation of judicial proceedings to be left uncorrected" (internal quotation marks omitted)). We are unwilling to speculate about the facts on which it was based, particularly in a situation like this, where the decision may have been based on a credibility determination or where there may be facts beyond the trial record that may have been considered had Tai not withdrawn his objection to the role enhancement. Thus, we express no view as to the applicability of the enhancement but rather, to ensure the integrity of the proceedings, we will remand for resentencing to allow the District Court to make factual findings concerning the culpability of the individuals with whom Tai worked and impose the enhancement if it finds at least one of these participants was criminally culpable. Pollen, 978 F.2d at 90.

## III

For the foregoing reasons, we will affirm the judgment of conviction and vacate and remand the judgment of sentence to address the applicability of the role enhancement.

22