NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-4336

_____

UNITED STATES OF AMERICA
v.
EUGENE GOLDMAN, MD,
also known as Yevgeniy Goldman,

Eugene Goldman, M.D.,
Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-12-cr-00305-001)
District Judge: Honorable Eduardo C. Robreno

_____

Submitted Under Third Circuit LAR 34.1(a)
March 2, 2015

Before: AMBRO, SCIRICA, and ROTH, <u>Circuit Judges</u>

(Filed: April 8, 2015)

_____

OPINION[*]

_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

AMBRO, Circuit Judge

Eugene Goldman, M.D., was convicted of four counts of receiving payment for Medicare referrals under 42 U.S.C. § 1320a-7b(b)(1)(A) (the "Anti-Kickback Statute") and conspiracy to do the same, 18 U.S.C. § 371. The District Court sentenced him to 51 months of incarceration and a three-year term of supervised release. A condition of his supervised release is that Goldman must refrain from practicing medicine for its duration. Goldman appeals his conviction and sentence, and we affirm both.

## I.

Goldman had a geriatric medicine practice in Northeast Philadelphia. In December 2000, he secured the position of Medical Director of Home Care Hospice ("HCH"). Alex Pugman served as Director of HCH, and his wife, Svetlana Ganetsky, was the Development Executive, responsible for marketing HCH to doctors and other healthcare professionals. According to his contract, Goldman was responsible for quality assurance, consultations, and the occasional meeting. In reality, his job was to refer patients to HCH.

Goldman was paid for the number of patients he referred to HCH and the length of their stay. Early in his relationship with HCH, Goldman was paid $200 per referral. By 2011, he received $400 per referral, with an additional $150 for each patient who stayed longer than a month. Ganetsky paid Goldman each month by check. Between 2002 and 2012, Goldman referred more than 400 Medicare patients to HCH and received approximately $310,000 in return.

2

In 2006 the FBI and Department of Health & Human Services began investigating HCH for Medicare fraud. The FBI followed up in 2008 by obtaining a search warrant and seizing over 500 boxes of documents and information from HCH's servers. Shortly after the raid, Ganetsky and Pugman approached the FBI and agreed to cooperate in the investigation. Ganetsky then recorded several meetings at which she paid Goldman for his referrals. Ganetsky made these payments with funds drawn from an account opened by the FBI for the investigation.

In June 2012 a grand jury indicted Goldman. A jury convicted him a year later.

## II.

Goldman challenges his conviction on three grounds. First, he claims that the evidence against him at trial was insufficient to support the jury's findings that he received "remuneration" and that he did so knowingly. As this argument is raised for the first time on appeal, we review for plain error, which means to reverse there must be error, it must be plain to detect, and it must affect substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). Moreover, it must "seriously affect the fairness, integrity or pubic perception of judicial proceedings." *Id.* (citations omitted).

The elements of an Anti-Kickback Statute violation are that the defendant (1) "knowingly and willfully"; (2) "solicit[ed] or receive[d] any remuneration" (3) "in return for referring an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(A). Goldman argues that because the payments were

3

provided in a "sting operation" with "sting money," which neither the FBI nor Ganetsky ever intended as actual payment for referrals, he was not in fact remunerated for patient referrals and thus did not violate the Anti-Kickback Statute.

This argument mischaracterizes the definition of remuneration. The Anti-Kickback Statute forbids "receiv[ing] *any* remuneration (including any kickback, bribe, or rebate)" in return for a referral, including remuneration paid "directly or indirectly, overtly or covertly, in cash or in kind." *Id.* § 1320a-7b(b)(1) (emphasis added). "Remuneration" means "[p]ayment" or "compensation." Black's Law Dictionary 1409 (9th ed. 2009). The statute's prohibition is broad: physicians may not accept "any" payment in exchange for referrals. Nor does the law limit "remuneration" by the type or source of the payment. If, for example, a defendant receives "cash," 42 U.S.C. § 1320a-7b(b)(1), or a check that can be reduced to cash, *United States v. Vernon*, 723 F.3d 1234, 1253 (11th Cir. 2013), in exchange for a referral, he has received illegal "remuneration" within the meaning of the Anti-Kickback Statute.

Goldman made referrals to HCH and in return was paid cash and checks. He received checks on January 9, 2009, and February 6, 2009, and a cash payment on March 12, 2009. Each of these payments was accompanied by a list of the referrals for which he was being compensated. Goldman accepted the cash, and he deposited the checks into his bank account. Each time he accepted a payment, Goldman received "remuneration" in exchange for a referral. The fact that it was sting money was irrelevant—it was still a

4

payment, and Goldman still received it for making referrals, making it illegal "remuneration."

Next, Goldman claims that the jury was improperly charged on the willfulness element of the Anti-Kickback Statute. He argues that instead of instructing the jury that his conduct was willful if he "knew his conduct was unlawful and intended to do something the law forbids," the District Court should have required the jury to find that he knew of the provision of the Anti-Kickback Statute under which he was charged and specifically intended to violate it. As with his first claim, Goldman raises this argument for the first time on appeal, and we again review for plain error.

The standard of willfulness Goldman seeks is reserved for "highly technical statutes that present the danger of ensnaring individuals engaged in apparently innocent conduct." *United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009). In these rare instances, the danger of punishing seemingly innocent conduct justifies "carv[ing] out an exception to the traditional rule that ignorance of the law is no excuse." *Bryan v. United States*, 524 U.S. 184, 195 (1998) (internal quotation marks omitted).

The District Court correctly instructed the jury on willfulness. The Anti-Kickback Statute is not "highly technical." Doctors are supposed to make decisions based on medical necessity, not their own fiscal interests; for that reason "taking . . . kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998); *see also United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996). An expert testified that all providers who participate in

5

Medicare are made aware of this prohibition and must certify that they will comply with it. Tr. of Test. of Carol Cagno at 78:9–13, *United States v. Goldman*, No. 2:12-cr-305 (E.D. Pa. May 31, 2013), ECF No. 45. In the face of such a widely known prohibition, accepting cash and checks in exchange for referrals cannot be considered "apparently innocent." *Bryan*, 524 U.S. at 195.

Next, Goldman claims that testimony of prosecution witnesses referring to payments he received as "kickbacks" or "illegal kickbacks" should have been excluded under Fed. R. Evid. 701 and 403 as unhelpful to the jury and unfairly prejudicial.

Evidentiary rulings are reviewed for abuse of discretion. *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 131 (3d Cir. 1997). An abuse of discretion occurs only where the district court's decision is "arbitrary, fanciful, or clearly unreasonable"—in short, where "no reasonable person would adopt the district court's view." *Starnes*, 583 F.3d at 214. Even if an evidentiary ruling is erroneous, we will not disturb a judgment if the error is harmless, that is, if it is "highly probable that the error did not contribute to the judgment." *United States v. Cunningham*, 694 F.3d 372, 391–92 (3d Cir. 2012).

Goldman claims that three Government witnesses improperly testified to "the ultimate factual and legal issue in the case—whether the payments to [him] were 'kickbacks' in the pertinent sense." App. Br. at 30. Each of these witnesses testified using the term "kickback" to describe the payments made to Goldman. Pugman testified, without objection, to the scheme he developed to pay kickbacks for referrals. Ganetsky also testified, also without objection, using the term kickback several times to describe

6

the illicit payment scheme in general and as to Goldman specifically. The defense objected only to the testimony of FBI Agent Conway, the agent in charge of the HCH investigation. In describing how the FBI controlled the funds used in its sting operation, Agent Conway characterized payments made to Goldman as "illegal kickbacks." Tr. of Test. of E. Edward Conway at 142:16–17, *United States v. Goldman*, No. 2:12-cr-305 (E.D. Pa. May 31, 2013), ECF No. 46.

Even assuming that this testimony was improperly admitted, any resulting error was harmless. The Government presented much evidence against Goldman. Ganetsky and Pugman, Goldman's co-conspirators, both testified that they paid Goldman for referrals, not for services rendered. Pugman detailed the scheme used to calculate each month's payment based on the number of patients Goldman referred that month and the number of patients referred in earlier months that remained in hospice care. Ganetsky testified that she delivered monthly checks to Goldman's office accompanied by the list of referrals for which Goldman was being paid. Transcripts of recordings of Goldman accepting these payments were read into the record. Further, the jurors were specifically instructed that it was their duty to determine how much weight to give to the testimony of law enforcement witnesses. In light of the overwhelming evidence presented against Goldman at trial, and that the jury was fully instructed on its role in determining credibility of witnesses and the weight to be given their testimony, it is not "highly probable" that any of these statements simply characterizing payments materially "contribute[d] to the judgment." *Cunningham*, 694 F.3d at 391–92.

**III.**

Goldman also challenges his sentence on two grounds. He first claims that the District Court erred in applying the abuse-of-position-of-trust enhancement to his sentence. U.S. Sentencing Guidelines Manual § 3B1.3 allows a two-level upward adjustment in offense level where the sentencing court finds that the defendant (1) occupied a position of public or private trust and (2) abused that position in a manner that significantly facilitated the commission or concealment of an offense. Goldman contends that he neither occupied a position of trust nor abused any such position. Our review is *de novo* over "the legal question of whether a position is one of trust," while "we review for clear error whether a defendant abused that position." *United States v. Sherman*, 160 F.3d 967, 969 (3d Cir. 1998).

A position of trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)," and "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. We apply a three-part test to determine whether a defendant occupied a position of trust: (1) whether the position allowed the defendant to commit a wrong that is difficult to detect; (2) the degree of authority the position vested in the defendant in connection with the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position. *United States v. Tai*, 750 F.3d 309, 316 (3d Cir. 2014).

8

As to the first factor, Goldman's positions as a geriatric physician and as Medical Director of HCH made the kickback scheme difficult to detect. He referred a significant number of patients for hospice care. Without more, these referrals seem like the ordinary duties of a physician. However, the evidence establishes that these referrals were made in exchange for money and regardless of medical necessity. Only a physician would be able to determine whether the referred patients were medically qualified for hospice care. "Indeed, it would be impossible to verify the accuracy of his [referrals] without a second and similarly qualified doctor reviewing the same information." *Tai*, 750 F.3d at 317. As for the second factor, Goldman's position as Medical Director of HCH allowed him to refer patients for Medicaid and Medicare-eligible services at his discretion and without any supervision. The third factor also weighs against Goldman, as both the Government and his patients relied on him to make decisions based on medical necessity, not the amount of money he would receive. He thus occupied a position of position of trust.

And Goldman abused that position. His positions as a medical doctor and Medical Director of HCH significantly facilitated the offense of receiving kickbacks; indeed they were critical to his scheme. Had he not held these positions, Goldman's referrals of patients to HCH would not have been possible.

Finally, Goldman argues that the District Court abused its discretion by imposing a special condition of supervised release prohibiting him from working as a doctor for three years. To impose an occupational restriction, a court must find that "(1) a reasonably direct relationship existed between the defendant's occupation, business, or

9

profession and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. § 5F1.5. Goldman claims that the restriction imposed by the sentencing court bears no relationship to the conduct underlying his convictions.

As Goldman did not object to this condition at sentencing, once again we review for plain error. *United States v. Evans*, 155 F.3d 245, 248 (3d Cir. 1998). On the merits, "we may . . . affirm the condition if we can ascertain any viable basis for the . . . restriction in the record before the District Court . . . on our own." *United States v. Voelker*, 489 F.3d 139, 144 (3d Cir. 2007) (internal quotation marks omitted; second and third ellipses in original).

While the factual findings set forth by the District Court here were little more than a recitation of the requirements for imposing a condition of supervised release, the record justifies the conditions imposed. There was a direct relationship between Goldman's positions as physician and Medical Director and his acceptance of kickbacks. He was only able to make the referrals for which he received illegal payments because he was a doctor. The restriction is also reasonably necessary to protect the public. Goldman followed this course of conduct for approximately ten years and referred more than 400 patients. In return for these referrals, he received over $300,000. The duration and profitability of Goldman's crimes give us reason to believe that, absent this restriction, he

will continue to engage in similar unlawful conduct.  Because there is more than a "tenuous" justification in the record, the occupational restriction on Goldman survives plain error review.  *United States v. Heckman*, 592 F.3d 400, 405 (3d Cir. 2010).

*     *     *     *     *

In this context, we affirm in all respects.