NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0283n.06

No. 15-1935

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 25, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,              )
                                       )
    Plaintiff-Appellee,                )
                                       )
v.                                     )      ON APPEAL FROM THE UNITED
                                       )      STATES DISTRICT COURT FOR THE
FARID FATA,                            )      EASTERN DISTRICT OF MICHIGAN
                                       )
    Defendant-Appellant.               )

---

BEFORE:  BOGGS and KETHLEDGE, Circuit Judges; STAFFORD, District Judge.[*]

STAFFORD, District Judge.  The defendant, Farid Fata, was a physician who intentionally mis-diagnosed no fewer than 553 of his patients with cancer and other maladies they did not have, then administered debilitating treatments, noxious chemicals, and invasive tests—including chemotherapy, intravenous iron, and PET scans—they did not need. For this reprehensible conduct, Fata received no less than $17 million in ill-gotten payments from Medicare and other insurers.  The district court accurately described Fata's conduct as "a huge, horrific, series of criminal acts."

Fata pleaded guilty to sixteen counts—thirteen counts of health-care fraud, one count of conspiracy to pay and receive kickbacks, and two counts of promotional money laundering.  He

---

[*] The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

did not have a Rule 11 plea agreement. After a five-day hearing, the district court sentenced Fata to 45 years in prison, a sentence within his guideline range of 360 months to life. Fata thereafter filed this timely appeal, arguing that the district court (1) erred in its application of "Role in the Offense" enhancements under sections 3B1.3 and 3B1.1 of the United States Sentencing Guidelines ("USSG"); (2) erred in allowing victim impact statements from patients whose status as actual "victims" had not been determined; and (3) lacked a sufficient factual basis to accept his guilty plea to the money laundering counts. Because Fata's arguments on appeal are without merit, we affirm.

I.

Fata first contends that the trial court erred in enhancing his sentence under USSG §§ 3B1.3 and 3B1.1. "In reviewing the district court's application of the sentencing guidelines, this court reviews the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. McCloud*, 730 F.3d 600, 605 (6th Cir. 2013).

Under § 3B1.3, a defendant's guideline range is increased by two levels if he "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." USSG § 3B1.3. Where this two-level enhancement is "based *solely* on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1" for aggravating role. *Id.* (emphasis added). On the other hand, "[i]f this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1." *Id.*

The offense-level calculations in Fata's Presentence Investigation Report ("PSR") included a two-level upward adjustment under § 3B1.3 based on Fata's abuse of a special skill. The PSR's calculations did not include an aggravating-role enhancement under § 3B1.1. The government objected to the calculations, arguing that the calculations should reflect both Fata's abuse of trust under § 3B1.3 and his aggravating role under § 3B1.1. While not disputing that Fata utilized special skills to commit his offenses, the government argued that Fata's "most significant abuse" under § 3B1.3 was his abuse of the trust position he held with respect to his patients and the organizations he billed for fraudulent services. Given the applicability of an abuse-of-trust adjustment under § 3B1.3, the government urged the district court to add a two-level adjustment under § 3B1.1 for Fata's leadership role in the kickback conspiracy. Fata responded to the government's argument by arguing that a special-skill enhancement was more appropriate because "[e]verything in this case stems from [Fata's] special skill." Fata accordingly urged the district court to adopt the calculations as presented by the probation officer. Persuaded by the government's arguments, the district court applied a two-level upward adjustment for abuse of trust under § 3B1.3 and then added another two-level upward adjustment under § 3B1.1(c) for aggravating role.[1]

The record amply supports the district court's two-level enhancement for abuse of trust. Prior to sentencing, Fata *admitted* that his offenses involved an abuse of trust. Indeed, after he

---

[1] The government argued for a four-level enhancement for aggravating role under § 3B1.1(a). That section applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The district court instead added two levels under § 3B1.1(c), which applies "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than [one that involved five or more participants or was otherwise extensive.]"

pleaded guilty, Fata entered into a stipulation with the government as follows: "The parties agree that the government could prove, by a preponderance of the evidence, that Fata's offense involved the abuse of a position of trust [under] Section 3B1.3." At sentencing, Fata spoke to the judge, saying that he "violated the medical oath . . . and caused anguish, hardship and pain to my patients and their families." Fata then added that he "grossly abused the trust that my patients placed in me. They came to me seeking compassion and care. I failed them." Fata's counsel similarly advised the judge at sentencing that Fata "admitted to [his probation officer] the first day we saw her . . . that he had betrayed the trust of his patients and took advantage of them in their most vulnerable state."

Per the Guidelines, a position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)," and subjects persons holding such positions "to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." USSG § 3B1.3, Application Note 1; *see also United States v. Gilliam*, 315 F.3d 614, 618 (6th Cir. 2003) (explaining that a "position of trust arises almost as if by implication when a person or organization intentionally makes himself or itself vulnerable to someone in a particular position, ceding to the other's presumed better judgment some control over their affairs" (internal quotation marks omitted)). That a doctor works with little supervision and exercises "substantial discretionary judgment that is ordinarily given considerable deference" is axiomatic. *See United States v. Kaminski*, 501 F.3d 655, 667 (6th Cir. 2007) (referring to the "mantle of trust" accorded to medical doctors). The Guidelines recognize as much, offering—as one example of a proper

abuse-of-trust enhancement—the "sexual abuse of a patient by a physician under the guise of an examination." § 3B1.3, Application Note 1.

Clearly, Fata occupied a position of trust vis-à-vis his patients within the meaning of § 3B1.3. With little supervision and a great deal of discretion, Fata was able to make false diagnoses and administer potentially deadly, yet unnecessary, courses of treatment for hundreds of patients who relied on his presumed integrity and accepted his presumed professional judgments—all to their detriment and to Fata's financial gain. Like the physician in the Guidelines example who sexually abuses a patient under the guise of an examination, Fata occupied a position of trust when he abused his patients by treating non-existent maladies with life-threatening chemicals.

Fata also occupied a position of trust vis- à-vis the insurers—both public and private—that he billed for fraudulent services. In *United States v. Hodge*, 259 F.3d 549 (6th Cir. 2001), this court held, "in accord with the other circuits," that:

> [C]ertain health care providers, or persons who hold themselves out as providers of care, occupy a position of trust with respect to both public and private insurance companies if they exercise professional or managerial discretion in treating patients and in billing for those treatments, which discretion is given deference by the insurers and helps to facilitate [a] crime. Our determination that health care providers may be subject to the § 3B1.3 adjustment is in harmony with our circuit's case law on this adjustment. Our precedents make clear that the touchstone for a finding that the defendant occupies a position of trust is not necessarily the amount of supervision the person receives, although that is an important factor to consider, but rather the amount of discretion the person has in his or her position of employment. Insurance companies must, for the most part, assume that health care providers are billing for services that they have actually performed. Because the methods available to insurance companies for assessing whether care providers have been honest . . . are limited, billing fraud is hard to detect, and insurance companies must ultimately defer to the health care providers' representations that service was performed.

*Id.* at 556 (citations omitted).

Not only did Fata occupy a position of trust, but that position also facilitated in a significant way his crimes of health-care fraud and conspiracy to pay and receive kickbacks. The discretion, the lack of supervision, and the deference granted to Fata by virtue of his being a physician not only placed him in the position to commit his offenses but also allowed him to victimize so many for so long for so much. As his criminal conduct illustrates, Fata took advantage of the trust of his patients and their insurers in a particularly heinous manner. For Fata, an enhancement for abuse of trust was appropriate. *See United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (finding that a physician's position of trust significantly facilitated the offense of receiving kickbacks for medical referrals); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) (upholding abuse-of-trust enhancement for psychologist who billed Medicare for services that had not been performed or services not performed as billed); *United States v. Sidhu*, 130 F.3d 644, 655–56 (5th Cir. 1997) (finding that a physician's abuse of his patients' trust significantly facilitated the physician's offense of defrauding various government programs and insurance companies by billing for services that were not performed or were not performed appropriately); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) (upholding abuse-of-trust enhancement for an internist who took illegal kickbacks from a cardiologist in exchange for patient referrals).

While not denying that Fata abused a position of trust with both his insurers and his patients, Fata contends (1) that the *sine qua non* of the offense behavior in this case was his use of special skills; and (2) that, of the two alternatives to enhancement set forth disjunctively in

§ 3B1.3, the district court should have selected the special-skill alternative as the more appropriate—and only—basis for the § 3B1.3 upward adjustment. Had the trial judge done so, the additional enhancement for aggravating role under § 3B1.1 would have been precluded.[2] Fata thus maintains that he is entitled to resentencing without the two-level enhancement for aggravating role.[3]

Fata's argument is not persuasive. As the first sentence of § 3B1.3 provides, a two-level increase in the Guidelines calculation is applicable if a defendant abused a position of trust *or* used a special skill to facilitate or conceal an offense. From that first sentence, it is reasonable to conclude that § 3B1.3 authorizes only a single two-level increase in the sentencing calculus. It does not allow for two-level increases for *both* abuse of trust and special use. However, as the word "solely" in the third sentence of § 3B1.3 implies, the two applications are not otherwise mutually exclusive. The third sentence of § 3B1.3 provides that a two-level aggravating-role enhancement under § 3B1.1 may not be applied if the § 3B1.3 adjustment "is based solely on the use of a special skill." That third sentence thus implies that a district court may add two-level adjustments under both § 3B1.3 and § 3B1.1 when the § 3B1.3 adjustment is based on either (1) abuse of trust alone, or (2) both abuse of trust and use of a special skill. If it were otherwise, the word "solely" in § 3B1.3 would be superfluous. *See United States v. Porcelli*, 440 F. App'x

---

[2] Without the § 3B1.1 two-level enhancement for aggravating role, Fata's sentencing range would have been 292–365 months, and the 45-year sentence that was imposed would have represented an upward variance.

[3] Fata does not contend that there are no facts to support the aggravating role enhancement. He limits his argument to the district court's purported error in attributing the § 3B1.3 enhancement to abuse of trust rather than solely to the use of a special skill.

870, 877 (11th Cir. 2011) (recognizing that a court may apply enhancements under both § 3B1.1 and § 3B1.3 "if the latter is based at least in part on an abuse of trust").

Here, the district court properly added two levels to Fata's Guidelines calculation based—at least in part—on Fata's abuse of a position of trust under § 3B1.3. Because Fata's § 3B1.3 adjustment was based at least in part on abuse of trust, the district court did not err in also adding two levels for aggravating role under § 3B1.1.

II.

Fata next contends that the district court erred by allowing victim impact statements, both written and oral, from patients whose status as actual "victims" was not confirmed. Even assuming that the district court considered statements from non-victim patients, Fata's claim of error is without merit.

It is well established that a district court may consider a wide variety of information at sentencing that could not otherwise be considered at trial. *See* 18 U.S.C. § 3661 (providing that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"); *Pepper v. United States*, 562 U.S. 476, 489 (2011) (noting that sentencing courts may appropriately "conduct an inquiry broad in scope, largely unlimited as to the kind of information they may consider, or the source from which it may come") (internal quotation marks and alteration omitted). The Sentencing Commission has incorporated the "no limitation" principle in the Guidelines by providing as follows: "In determining the sentence to impose within the guideline range, or whether a departure from the

guidelines is warranted, the court may consider, *without limitation*, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." USSG § 1B1.4 (emphasis added); *see also United States v. Case*, 434 F. App'x 522, 523 (6th Cir. 2011) (noting that the district court "could freely consider" statements from the defendant's sister-in-law and mother-in-law, "regardless of whether the in-laws were properly characterized as 'victims'"). The law thus makes clear that the district court in this case was permitted to consider oral and written statements from Fata's patients, whether or not those patients were confirmed as "victims."

In any event, the district court decided *not* to rely on the patients' statements in determining Fata's sentence. The district court expressly explained that it was unnecessary to rely on them because the expert testimony and Fata's pleas "provide[d] a basis for the sentencing." To the extent, *if any*, that the district court considered patient statements, Fata's sentence was not rendered unreasonable.

### III.

Finally, Fata claims for the first time on appeal that his guilty pleas to promotional money laundering (Counts 22 and 23) were not supported by a sufficient factual basis. This claim is reviewed for plain error. Under the plain-error standard, Fata must show "(1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner,* 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation marks omitted).

A district court must determine that there is a "factual basis" for a guilty plea "[b]efore entering judgment" on that plea. Fed. R. Crim. P. 11(b)(3). Because a sufficient factual basis need be present only by the time of judgment, it is not necessary that the factual basis be established at the plea hearing. Judges may draw factual bases from many sources, including such post-plea sources as the defendant's PSR and testimony proffered at sentencing. *United States v. Byrd*, 220 F. App'x 421, 425 (6th Cir. 2007); *United States v. Bennett*, 291 F.3d 888, 896–97 (6th Cir. 2002).

The elements of promotional money laundering, prohibited by 18 U.S.C. § 1956(a)(1)(A)(i), are that the defendant "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was the proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *United States v. Prince*, 618 F.3d 551, 554 (6th Cir. 2010) (internal quotation marks omitted). Fata challenges only the third element: intent to promote the unlawful activity.

Fata focuses on the plea colloquy only. At the plea hearing, Fata was asked to recite the facts supporting the two promotional money laundering counts. He testified as follows:

> THE DEFENDANT: As I previously stated in other counts, I submitted claims to various insurance companies and Medicare for unnecessary services and infusions through my company, Michigan Hematology Oncology [MHO]. In 2013 I incorporated a new company, United Diagnostics, that would perform tests such as PET scan[s]. . . . United Diagnostics was funded in part using funds that I had earned through my submission of claims for unnecessary services. . . . I deposited or caused the deposit of two checks from MHO to United Diagnostics –
>
> THE COURT: From who?
>
> THE DEFENDANT: Michigan Hematology Oncology to United Diagnostics on May 3rd, 2013 . . . and July 2nd, 2013.

THE COURT: Okay.

THE DEFENDANT: Each written in the amount of $100,000.

THE COURT: Okay.

THE DEFENDANT: After United Diagnostics became operational, I submitted false claims . . . for certain patients for unnecessary PET scans through United Diagnostics.

According to Fata, this plea colloquy "wholly fails to establish that he engaged in the financial transactions funding United Diagnostics with the specific intent to promote the submission of false medical claims."

Even assuming the plea colloquy was insufficient by itself to establish a factual basis for the third element of the money-laundering counts, the record as a whole supports the district court's finding that Fata deposited checks from MHO with the intent to promote health- care fraud at United Diagnostics. Before judgment was entered, the district court was able to consider the PSR,[4] the parties' pre-sentence stipulation,[5] and the sentencing documents proffered by the prosecutor, including the record of interviews taken of medical assistants who worked for Fata at MHO. From those interviews and the record as a whole, the district court had the following information: (1) United Diagnostics was originally scheduled to open in April 2013; (2) There was a huge increase in the number of PET-scan orders signed by Fata beginning in February 2013, all to be done when United Diagnostics opened its doors, supposedly in April; (3) When the opening

---

[4] Fata filed no objections to the paragraphs in the PSR that related to the money laundering counts.

[5] After Fata entered his plea but before he was sentenced, the parties stipulated that "consistent with his guilty plea, Fata's offense involved money laundering under 18 U.S.C. Section 1956." Sealed Stip., Doc. 147–2, Ex. A in the record of the district court in this case (Case No. 2:13cr20600–PDB–DRG).

of United Diagnostics was delayed until July, Fata instructed his staff to reschedule the PET- scan appointments, delaying them to July and August when scans could be done at United Diagnostics; (4) Fata made clear to his staff that he did not want his patients referred to other facilities for scans; (5) When patients questioned the delays and asked for referrals to other PET scan facilities, Fata instructed his staff to lie to the patients rather than referring them elsewhere; (6) Fata deposited $100,000 into the bank account of United Diagnostics on May 3, 2013, and again on July 2, 2013, during the very time period when scans were being rescheduled at United Diagnostics and referrals were being refused; and (7) The $100,000 checks came from MHO's bank account. This information—combined with Fata's admission that he was guilty of laundering money in violation of 18 U.S.C. § 1956(a)(1)(A)(i)—was more than enough to provide a sufficient factual basis to determine that Fata transferred MHO funds to United Diagnostics with the specific intent to promote the submission of false medical claims at United Diagnostics. The district court did not err, much less commit plain error, when it accepted Fata's guilty plea to the money-laundering counts.

IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.